**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

Kenneth Kannapel                                                                                    **Plaintiff**

v.                                                                             **No. 3:20-cv-500-BJB-RSE**

**International Business Machines Corporation**                                        **Defendant**

\* \* \* \* \*

## OPINION AND ORDER

Kenneth Kannapel, an IBM sales representative, sued IBM after it denied him a commission he says should've totaled $2.4 million following a large sale of software and services to Humana. The parties agree that no contract governs his compensation in this circumstance, so Kannapel seeks to recover damages through a host of tort, statutory, and equitable claims against the company. IBM, resting largely on disclosures contained in an "Incentive Plan Letter" that it distributed and Kannapel acknowledged receiving, has asked the court to dismiss each claim because the company retained exclusive discretion to make, revise, or altogether deny commission payments, rendering Kannapel's contrary expectation unreasonable as a matter of law. But the Incentive Plan Letter provisions, at least on their face, are not as broad and clear as IBM asserts. Because those provisions don't foreclose Kannapel's allegations that he reasonably expected a commission based on IBM's promises, the Court substantially denies the motion, dismissing only Kannapel's negligent-misrepresentation claim.

### I.    Background

In reviewing this motion to dismiss, the Court accepts all the plaintiff's factual allegations as true, draws all reasonable inferences in the plaintiff's favor, and determines whether those facts and inferences plausibly entitle the plaintiff to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (discussing Fed. R. Civ. P. 12(b)(6)). To survive a motion to dismiss, the complaint "must present sufficient facts to 'state a claim to relief that is plausible on its face.'" *Robbins v. New Cingular Wireless PCS, LLC*, 854 F.3d 315, 319 (6th Cir. 2017) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

\* \* \*

Kenneth Kannapel became an IBM sales representative in 1989. Amended Complaint (DN 13 ¶¶ 6, 12). In this role he sells IBM products and services to companies around the world. Am. Compl. ¶ 54. IBM pays Kannapel a base salary as well as commissions based "on the actual amount of sales closed" in a six-month period. Am. Compl. ¶¶ 14, 23.

IBM assigned Kannapel exclusively to its Humana account in 2011. Am. Compl. ¶ 47. In early 2019, Kannapel completed a sale to Humana worth $220 million. Am. Compl. ¶¶ 55–56. Kannapel expected a $2.4 million commission from that sale. ¶ 58. But Kannapel alleges that

IBM never paid him any commission at all.  Am. Compl.  ¶¶ 58, 60–61.  IBM strongly denies this characterization, but acknowledges the Court must accept it at the pleadings stage.  Oral Argument Transcript (DN 29 at 14:1–6).  According to new company procedures, Kannapel asserts, IBM decided it would pay no commissions on sales over $10 million.  ¶¶ 61–62.  Kannapel claims he was unaware of this new policy, which he believes IBM shared only with a limited number of high-level executives.  ¶¶ 62, 67.

No employment contract governs Kannapel's employment or commissions.  Arg. Tr. at 50:10–12.  But Kannapel asserts that IBM's representations regarding his entitlement to a commission render IBM liable for the unpaid amount.

Kannapel rests his claims on IBM's statements to him and other salespeople in a series of PowerPoint presentations.  Twice a year, IBM shared PowerPoint slides with its sales representatives, including Kannapel, to help them "understand the terms of their commissions compensation."  Am. Compl. ¶ 26.  IBM posted the PowerPoint slides on an internal company portal for sales representatives to review.  Am. Compl. ¶ 24.  In his complaint, Kannapel describes several representations in the PowerPoint slides:

> 30. The PowerPoint contained several representations that were applicable to [IBM's quota plan for Kannapel], including that the plan:
> a. Was "Line of Sight";
> b. Was "Payout Table Driven"; and
> c. Consisted of "Ledger-Based & Automated Measurements."

> 31. On slide 3, the PowerPoint states in relevant part:

>> Individual quota plans are deployed when a seller has direct client responsibility with a defined territory set by either specific clients or geography.  Along with a defined client set the individual quota plan is **"line of sight"** which simply means that **when the seller sells "x" they earn "y."**  Said another way earnings are payout table driven in that there's a percent of Target Incentive earned for each percent of attainment against quota.

> 32. Slide four continues to emphasize how straightforward [IBM's quota plan for Kannapel] is, stating:  "[t]he individual quota plan is pretty straight forward.  Paying a percent of Target Incentive (TI) for each % of achievement with accelerators for over achievement."

> 33. The slide continues, showing a payout table that was applicable to Mr. Kannapel and stating:  "**1:1 payout table** for up to 100% attainment, then stating "2.5x accelerator for each percentage of attainment over 100% and up to 300%," and concluding "Accelerator reverts back to 1x for attainment over 300%."

2

¶¶ 30–33 (emphases added); *see also* PowerPoint Slides (DN 13-3).  Kannapel asserts that these PowerPoint slides describe an "unlimited" commissions structure, in which sales representatives received commissions based on the size of a sale relative to the representative's sales quota and commission formula.  Am. Compl. ¶¶ 21–22.  Kannapel contends this commissions guarantee was false:  he received no commission on a major sale.  He also alleges that false oral statements by IBM management fueled his misperception about unlimited commissions, and that, in his thirty years selling for IBM, he always received commissions in line with the size of a sale.  Am. Compl. ¶¶ 44–45.

The PowerPoint, however, is not the only relevant noncontractual document in this case.  IBM also provided Kannapel with a biannual Incentive Plan Letter ("IPL"), a short document describing Kannapel's sales quota and financial targets.  *See* IPL (DN 14-1).[1]  Kannapel acknowledged his IPL electronically, *id*. at 1, but neither party contends the IPL is an enforceable contract, Response (DN 18 at 22); Reply (DN 20 at 13) ("Plaintiff's IPL does not create an enforceable contract….").

Despite the IPL's noncontractual nature, IBM asserts that several provisions in the IPL, discussed below, undermine Kannapel's claim that IBM asserted it would pay a commission based solely on the sale size, without any further review or refinement.  According to IBM, the IPL provisions vest it with "unlimited discretion to review and modify" sales representatives' "commission payments at any time."  *See* Motion to Dismiss (DN 14 at 3).

Kannapel is not the first IBM sales representative to sue the company over unpaid commissions.  The lawyers in this case have litigated several other suits across the country involving IBM sales representatives and similar facts,[2] and raise many arguments based on those allegations and decisions in their briefing here.  This case appears to differ from all the other cases (at least those that didn't treat the IPL as a contract), *see, e.g.*, *Rapier v. IBM*, No. 1:17-cv-4740, 2018 U.S. Dist. Lexis 117504 (N.D. Ga. Apr. 12, 2018), in at least one significant way: those sales-rep/plaintiffs asserted that they received "capped" commissions (that is, IBM paid a commission,

---

[1] Kannapel did not attach the IPL to his complaint.  But IBM attached the IPL to its motion to dismiss.  In response to a motion to dismiss, a court may consider a document not attached to a complaint, without converting to a motion for summary judgment, if the "document is referred to in the complaint and is central to the plaintiff's claim."  *Greenberg v. Life Ins. Co. of Va.*, 177 F.3d 507, 514 (6th Cir. 1999) (quotation omitted).  Kannapel's complaint repeatedly cites the IPL and refers to his sales quota and commission structure as contained in the IPL.  *See, e.g.,* Am. Compl. ¶¶ 14–17.  Both parties agreed the Court may consider the IPL in deciding this Motion to Dismiss.  *See* Arg. Tr. at 14:10–20.

[2] *See Martignetti v. IBM*, 855 F. App'x 857 (4th Cir. 2021) (fraud, negligent-misrepresentation, and unjust-enrichment claims adequately pled based on capped-commission allegations); *Fessler v. IBM*, 959 F.3d 146 (4th Cir. 2020) (same); *Middleton v. IBM*, 787 F. App'x 619 (11th Cir. 2019) (IPL precluded claims of fraudulent and negligent misrepresentation based on capped-commission allegations); *Cahey v. IBM*, No. 20-cv-781, 2020 WL 5203787 (D. Colo. Sept. 1, 2020) (IPL negated reliance for fraudulent misrepresentation but not unjust enrichment because IPL was not an enforceable contract); *Stephenson v. IBM*, No. 17-cv-1141, 2020 WL 3960955 (M.D.N.C. July 13, 2020) (denying summary judgment based on evidence of capped-commission representations); *Beard v. IBM*, No. 18-6783, 2020 WL 1812171 (N.D. Cal. Apr. 9, 2020) (same); *Swafford v. IBM*, 408 F. Supp. 3d 1131 (N.D. Cal. 2019) (same); *Vinson v. IBM*, No. 1:17-cv-798, 2018 WL 4608250 (M.D.N.C. Sept. 25, 2018) (same).

but not a commission as large as the representative thought justified on a large sale). Kannapel, by contrast, asserts he received no commission *at all*. Am. Compl. ¶¶ 60–61; *see* Response at 14.

Kannapel's complaint alleges five common-law causes of action: (1) fraudulent misrepresentation, (2) fraudulent omission, (3) negligent misrepresentation, (4) unjust enrichment, and (5) quantum meruit. Am. Compl. ¶¶ 110–133, 146–155. It also asserts a statutory claim under Kentucky Wage & Hour Laws, KRS § 337.020.[3] All Kannapel's claims are directed at recovering the commission he claims he was due on the Humana sale, based on IBM's PowerPoint descriptions of its commission policy, oral representations IBM leaders made to him, and three decades of IBM sales experience.

## II.   Tort Claims:   Fraudulent Misrepresentation, Fraudulent Omission, Negligent Misrepresentation

### a.   Reasonable Reliance

All three tort claims—fraudulent misrepresentation and omission, as well as negligent misrepresentation—require plaintiffs to show they "reasonably relied" on the defendant's representations. *See Flegles, Inc. v. TruServ Corp*., 289 S.W.3d 544, 549 (Ky. 2009) (fraudulent misrepresentation); *Giddings & Lewis, Inc. v. Indus. Risk Insurers*, 348 S.W.3d 729, 747 (Ky. 2011) (fraudulent omission); *Presnell Constr. Managers, v. EH Constr*., 134 S.W.3d 575, 580 (Ky. 2004) (negligent misrepresentation).[4] To establish reasonable reliance under Kentucky law, a plaintiff "must be justified in relying upon the representations in the exercise of common prudence and diligence." *Wells v. Huish Detergents, Inc*., 19 F. App'x 168, 177 (6th Cir. 2001) (citing *Selke v. Stewart*, 260 Ky. 442, 86 S.W.2d 83, 87 (Ky. Ct. App. 1935)). Reliance is "nearly always a question of fact for the jury," but a court may decide reliance as a matter of law "if it appears absolutely clear from the record that the party did not or could not rely justifiably on the communication." *Thomas v. Schneider*, 2010 WL 3447662, at *4 (Ky. Ct. App. Sept. 3, 2010) (citations omitted).

---

[3] The complaint also asserts a cause of action for punitive damages in Count VI. A "claim for punitive damages is not a separate cause of action," but instead "a remedy potentially available for another cause of action." *Dalton v. Animas Corp*., 913 F. Supp. 2d 370, 378 (W.D. Ky. 2012). Kentucky law permits punitive damages "if a plaintiff proves by clear and convincing evidence that a defendant acted with fraud …." *Yung v. Grant Thornton, LLP*, 563 S.W.3d 22, 65 (Ky. 2018). Kannapel's potential punitive-damages remedy depends on his fraudulent misrepresentation and fraudulent omission causes of action.

[4] Kannapel's complaint pled "fraudulent misrepresentation/omission" as a single cause of action. Am. Compl. ¶¶ 110–122. But Kentucky law treats "fraudulent misrepresentation" and "fraudulent omission" as distinct causes of action, so the Court will consider them separately. *See Giddings & Lewis*, 348 S.W.3d at 747 ("Fraud by omission is not the same, at law, as fraud by misrepresentation, and has substantially different elements.") (quotation omitted). Kentucky courts have not explicitly stated that reasonable reliance is an element of a fraudulent omission claim. The Sixth Circuit, however, recently assumed it was. *Bisig v. Time Warner Cable, Inc*., 940 F.3d 205, 213–14 (6th Cir. 2019) (suggesting that reasonable reliance is an element of fraudulent omission in Kentucky but deciding the question on other grounds). Given the resolution of this issue, the Court will assume without deciding that reasonable reliance is an element of fraudulent omission in Kentucky.

Kannapel asserts that he reasonably relied on IBM's PowerPoint statements about formulaic commission payments. The PowerPoint slides stated that he would be paid one percent commission on all sales up to his quota, two-and-a-half percent commission on all sales between 100 percent and 300 percent of his quota, and one percent commission on all sales above 300 percent of his quota. *See* PowerPoint (DN 13-3 at 5); Am. Compl. ¶ 33. After seeing these representations, according to Kannapel, he closed a single large sale of IBM software and services to Humana. Had he known the truth, Kannapel asserts, he could have structured his efforts differently, such as by splitting the sale into multiple smaller sales that would have enabled him to earn a commission. ¶¶ 55, 69–71.

IBM hardly contests whether an employee could have reasonably relied on the PowerPoint statements alone. Instead, IBM contends those statements were *not* conveyed in isolation: rather, the IPL included clear disclaimers, acknowledged and agreed to by Kannapel, indicating he could not reasonably rely on contrary statements in the PowerPoint. Motion to Dismiss at 8–11. The alleged disclaimers include statements that:

- "IBM reserves the right to adjust the Plan terms…or to modify or cancel the Plan,"

- "IBM reserves the right to review and, in its sole discretion, adjust or require repayment of incorrect incentive payments," and

- "If a specific customer transaction has a disproportionate effect on an incentive payment…IBM reserves the right to review and, in its sole discretion, adjust the incentive achievement."

Motion to Dismiss at 3. These IPL disclaimers, say IBM, would put any reasonable sales representative on notice that a commission was *not* guaranteed. *See Rivermont Inn, Inc. v. Bass Hotels & Resorts, Inc.*, 113 S.W.3d 636, 640 (Ky. Ct. App. 2003) (a person "may not rely on oral representations that conflict with written disclaimers to the contrary which the complaining party earlier specifically acknowledged in writing"). As explained by the First Circuit precedent followed by the Kentucky Court of Appeals in *Rivermont Inn, id.* at 640–41, "[w]hen a person acts in a way contrary to his own acknowledged understanding of the facts, his acts must be deemed unreasonable as a matter of law," *Trifiro v. New York Life Ins. Co.*, 845 F.2d 30, 33 (1st Cir. 1988).

So the question at the pleading stage is whether the statements Kannapel relies on "conflict with written disclaimers to the contrary which [he] specifically acknowledged in writing." *Rivermont Inn*, 113 S.W.3d at 640–41 (citing *Trifiro*). Reading the provisions in the light most favorable to Kannapel, the PowerPoint slides and the IPL provisions are not in conflict: the IPL provisions do not state that IBM has "unlimited discretion" to deny a salesperson like Kannapel a commission. *Contra* Motion to Dismiss at 3.

As an initial matter, Kannapel's IPL contains no blanket disclaimer that would broadly foreclose reliance on *all* other statements or representations. IPL at 2–3. No one disputes this. Rather, IBM points to four narrower provisions, which it characterizes as disclaimers, and primarily to one labeled "*Review of a Specific Transaction*":

If a specific customer transaction has a disproportionate effect on an incentive payment when compared with the opportunity anticipated during account planning

and used for the setting of sales objectives, or is disproportionate compared with your performance contribution towards the transaction, IBM reserves the right to review and, in its sole discretion, adjust the incentive achievement and/or related payments.

IPL at 3.

To IBM, this must've told Kannapel that IBM retained "unlimited discretion" whether to award commissions, and if so in what amounts. Motion to Dismiss at 3. But the specific-transaction provision doesn't say that. The IPL purports to retain IBM's "right to review and … adjust … incentive achievement and/or related payments" *only if* "a specific customer transaction has a disproportionate effect on an incentive payment." The right to review is limited to payments disproportionately affected by a specific transaction. This is not "unlimited" authority to review and adjust commissions. IBM's discretion depends on a threshold condition—"disproportionate effect"—that Kannapel, unsurprisingly, has not pled. At this stage, nothing before the Court speaks to what the default "incentive payment" would've been in this scenario, whether the Humana deal's effect was "disproportionate," what "opportunity" the parties "anticipated during account planning," Kannapel's "sales objectives," or Kannapel's "performance contribution." IPL at 3. This provision is reconcilable with Kannapel's professed expectation that he would receive a commission; it does not—at least not on its face—defeat Kannapel's allegation of reasonable reliance.

If anything, the transaction-review provision appears to presume that IBM would make *some* sort of payment—not one "adjust[ed]" to zero. Giving the word "adjust" its "ordinary meaning," *Frear v. P.T.A. Indus., Inc.*, 103 S.W.3d 99, 106 (Ky. 2003), suggests an alteration, not a cancelation. *See, e.g.*, *Adjust*, WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 57 (9th ed. 1991) ("to bring to a more satisfactory state: rectify"); *Adjust*, CAMBRIDGE DICTIONARY ONLINE ("to change something *slightly* …") (emphasis added), *Adjustment*, BLACK'S LAW DICTIONARY 52 (11th ed. 2019) ("The act of settling or arranging. . . ."). IBM cites no definition of the term that would readily support IBM's position that it encompasses even an "adjustment" to zero. So the Court cannot rule out Kannapel's narrower and more natural interpretation at the pleading stage. The U.S. Supreme Court confronted a similar question, and gave a similar answer, when it held in *MCI v. AT&T* that the statutory term "to modify" did not permit a federal agency to make a "fundamental" change because the word contemplated only small or incremental changes. 512 U.S. 218, 225–32 (1994).

Evidence may eventually show, of course, that the conditions precedent triggering the transaction-review provision were satisfied, allowing IBM to adjust the commission to zero, or that the court should read the provision altogether differently. The pleadings and IPL language alone, however, do not defeat reasonable reliance as a matter of law. *See Thomas*, 2010 WL 3447662, at *4; *IAS Servs. Grp., LLC v. Jim Buckley & Assocs.*, 900 F.3d 640, 651 (5th Cir. 2018) (ambiguous contract provision did not disclaim reasonable reliance on a conflicting clause because the provision "is not the kind of unequivocal statement that can disclaim reliance or create a red flag as a matter of law").

The remaining three of IBM's four cited IPL provisions fare no better.  None purport to give IBM complete discretion to deny a commission in a manner that contradicts the representations Kannapel allegedly relied on.

The second—an "*Adjustments for Errors*" provision[5]—doesn't help IBM at the motion-to-dismiss stage for the same reasons that trip up the transaction-review provision discussed above.  IBM's right to "review, and in its sole discretion, adjust or require repayment of incorrect incentive payments," IPL at 3, again turns on the definition of the word "adjust," which is more limited than IBM asserts for all the reasons just discussed.  This provision also depends on an "incorrect" incentive payment, which IBM cannot assume in light of Kannapel's well-pled allegation that the commission he seeks was the correct one under IBM policy.

Third, the "*Right to Modify or Cancel*" provision[6] doesn't speak to individual commissions at all.  Instead it addresses IBM's authority to "modify or cancel *the Plan*."  IPL at 2.  Neither Kannapel's complaint nor IBM's motion assert IBM ever actually took this step.  Absent an allegation that IBM did in fact cancel the Plan, which is (again and unsurprisingly) nowhere to be found in Kannapel's amended complaint, this contingent authority cannot defeat Kannapel's allegation of reliance as a matter of law.  A district court in North Carolina has read the "Right to Modify or Cancel" provision in the same manner, holding it did not allow IBM to cap a salesman's commissions by purporting to alter the Plan after the salesman "earned" commissions under a prior iteration.  *See Vinson*, 2018 WL 4608250, at *10.

Fourth, the "Earnings" provision offers no shield for IBM at this stage.  It characterizes "[i]ncentive payments" as "advance payment[s]" that "are earned … only after" the Plan period ends.  IPL at 2.[7]  But Kannapel alleges that he "earned" his commission, Am. Compl.  ¶¶ 58, 60, and at least implies that IBM measured complete business results.  Nothing about the "Earnings" provision indicates that Kannapel should've known that IBM could deny sales representatives commissions either before or after a Plan period.

These four provisions suggest IBM told sales representatives that the company could, under certain circumstances, reduce their commissions or even cancel their incentive plans.  But they do

---

[5] "*Adjustments for Errors*. IBM reserves the right to review and, in its sole discretion, adjust or require repayment of incorrect incentive payments resulting from incomplete incentive processes or other errors in the measurement of achievement or the calculation of payments, including errors in the creation or communication of sales objectives. Depending on when an error is identified, corrections may be made before or after the last day of the full-Plan period, and before or after the affected payment has been released." Motion to Dismiss at 3.

[6] "*Right to Modify or Cancel*. IBM reserves the right to adjust the Plan terms, including, but not limited to, changes to sales performance objectives, assigned territories or account opportunities, applicable incentive payment rates or similar earnings opportunities, or to modify or cancel the Plan, for any individual or group of individuals, including withdrawing an offered or accepted IPL." Motion to Dismiss at 3.

[7] "*Earnings*. Incentive payments you may receive for Plan-to-Date achievement are a form of advance payment based on incomplete business results. Your incentive payments are earned under the Plan terms, and are no longer considered Plan-to-Date advance payments, only after the measurement of complete business results following the end of the full-Plan period…." Motion to Dismiss at 4.

not state either possibility so clearly that Kannapel couldn't reasonably rely on other IBM statements that the plan persisted and would reward Kannapel with a predetermined commission.[8] IBM cannot win dismissal of all three tort claims based on Kannapel's allegedly unreasonable reliance.

### b. Fraudulent Misrepresentation

A fraudulent-misrepresentation claim under Kentucky law requires proof that "(1) the defendant made a material representation to the plaintiff; (2) the representation was false; (3) the defendant knew the representation to be false or made it with reckless disregard for its truth or falsity; (4) the defendant intended to induce the plaintiff to act upon the misrepresentation; (5) the plaintiff reasonably relied upon the misrepresentation; and (6) the misrepresentation caused injury to the plaintiff." *Giddings & Lewis*, 348 S.W.3d at 747. The complaint must satisfy Rule 9(b)'s heightened pleading standard for fraud claims. Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.").

In addition to reasonable reliance (discussed above), IBM's motion implicates two other elements of the fraudulent-misrepresentation claim: falsity and intent to induce reliance.

First, IBM argues that the PowerPoint slides contained no false representations because the PowerPoint was consistent with the IPL. In IBM's view (but not the Court's) the IPL indisputably allowed the payment of zero-dollar commissions. Motion to Dismiss at 6; Reply at 5. That may be IBM's theory of the case, but it isn't Kannapel's. He alleges that the PowerPoint representations were false because IBM didn't pay the commission the slides promised. *See* Am. Compl. ¶¶ 32–33 (alleging that the PowerPoint slides promised straightforward quota payments based on a defined formula). At oral argument, Kannapel put it plainly: "The clearest distillation … is when seller sells X, they get paid Y, but that was false, because … there was no Y. It was zero dollars." Arg. Tr. at 12:2–5. Kannapel alleges that the PowerPoint included a "payout table" explaining sales representatives' commission payments relative to sale size, Am. Compl. ¶ 33, yet he was not paid in line with those figures, Am. Compl. ¶¶ 61–65. At the motion-to-dismiss phase, Kannapel's pleadings alleging falsehoods in the PowerPoint presentation need not give way to IBM's contrary assertions.

Second, IBM maintains it never intended to deceive Kannapel (or "induce reliance," *see Giddings & Lewis*, 348 S.W.3d at 747) because the IPL clearly notified Kannapel of IBM's right to adjust commission payments. Motion to Dismiss at 8. As noted above, however, the IPL disclaimers are not as clear-cut as IBM maintains. Regardless, this argument ignores Kannapel's

---

[8] IBM also rests part of its argument on "Quota Setting Guidelines," which it says gave IBM executives the ability to deny Kannapel a commission payment. *See* Reply at 6. The Quota Setting Guidelines are relevant because IBM allegedly denied Kannapel's commission based on a provision in the Guidelines eliminating any commissions on sales over $10 million. Am. Compl. ¶¶ 61–62, 66–67. Kannapel, however, disputes IBM's position as a factual matter: he alleges that sales representatives "have no access to [the Guidelines]" and that IBM never told Kannapel about this provision. ¶¶ 66–67. IBM disagrees, maintaining that Kannapel did have access through a hyperlink in the IPL. Reply at 8. This is a classic factual dispute that a court may not resolve on a motion to dismiss. *See* Arg. Tr. at 13:18–14:6 (IBM's agreement that consideration of Quota Setting Guidelines is not relevant on motion to dismiss).

allegation that IBM deceived him in the *PowerPoint*, not the IPL.  *See* Am. Compl. ¶ 113.  IBM, not Kannapel, is the one bringing in the IPL at the pleading stage; Kannapel grounds his reliance and inducement allegations in the PowerPoint slides.  *See* § II(a) above.  And if Kannapel proves that IBM intended to deceive him through the PowerPoint slides, the allegedly benign intent of the IPL will not necessarily defeat liability.

### c.  Fraudulent Omission

Fraudulent omission "is grounded in a duty to disclose."  *Giddings & Lewis*, 348 S.W.3d at 747.  The tort contains four elements:  "(1) the defendant had a duty to disclose the material fact at issue; (2) the defendant failed to disclose the fact; (3) the defendant's failure to disclose the material fact induced the plaintiff to act; and (4) the plaintiff suffered actual damages as a consequence."  *Id*.  A defendant has a duty to disclose "only where a confidential or fiduciary relationship between the parties exists, or when a statute imposes such a duty, or when a defendant has partially disclosed material facts to the plaintiff but created the impression of full disclosure."  *Rivermont*, 113 S.W.3d at 641.

Here, Kannapel appears to rely on the third aspect of the duty to disclose: partial disclosure with the impression of full disclosure.  *See id*.  He asserts that IBM "chose to speak by telling [Kannapel] and others that their commissions would not be capped," which created a duty to make a "full and fair disclosure."  Am. Compl. ¶ 115.  The disclosure was not complete, according to Kannapel, because IBM did not disclose its purported $10 million cap in the Quota Setting Guidelines.  ¶¶ 111–112.

IBM does not challenge this asserted duty of disclosure (and in any event, the Quota Setting Guidelines are not properly before the Court at this stage).  IBM only challenges Kannapel's alleged lack of reasonable reliance.  Motion to Dismiss at 8–9.  But for the reasons stated above, *see* § II(a), the Court cannot determine that Kannapel's reliance was unreasonable as a matter of law.

### d.  Negligent Misrepresentation

As an alternative to his fraudulent-misrepresentation claims, *see* Am. Compl. ¶ 123, Kannapel asserts a *negligent*-misrepresentation claim.  Kentucky has adopted the Restatement (Second) of Torts standard (§ 552) for negligent misrepresentation claims.  *Presnell Constr. Managers*, 134 S.W.3d at 576–77.  Section 552(1) provides that:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

The question here is whether IBM, "in the course of [its] business," supplied the PowerPoint information "for the guidance of others"—namely Kannapel—"in [his] business

transactions." *Id.* None of the Kentucky decisions interpreting § 552 extend the tort to communications in the employment context, but neither do they cabin the provision's scope in a manner that squarely forecloses such a claim.

The text of the Restatement addresses defendants who "suppl[y] false information for the guidance of *others* in their business transactions…." R.2d Torts § 552(1) (emphasis added). So both plaintiffs and defendants are described in terms of their own, apparently independent, business transactions—not in terms of a transmission of information, within a single business, that may or may not involve a transaction at all. On Kannapel's reading, however, the employer's "course of business" would be identical to the employee's "business transactions." Stranger still: any "loss caused" by the employee's "reliance" on workplace instructions normally would be borne by the employer, not the employee himself. And why refer to workplace instructions as the "guidance of others"? The Restatement of Employment Law, for what it's worth, defines an employee as one "*prevent[ed]* … from rendering … services as an independent businessperson" within the scope of that employment, § 1.01(a)(1), (3) (emphasis added), not one engaged in transactions independent of the employer. All of which makes the language of § 552 an unusual way for the drafters to have brought employment-related claims within the limits of the provision if—as IBM implies—that's what the drafters meant to do.

Indeed, the drafters *did* refer to employment, though the parties haven't addressed that critical textual clue. Section 552(1) expressly refers to "employment"—but only in connection with the *defendant's* "business, profession, or employment." The omission of that most relevant term in connection with the *plaintiff's* "business transactions" narrows the circumstances in which plaintiffs may recover, and surely cuts against a reading that would extend liability to employees who suffered loss in their employment. *See, e.g., Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 381 (2013) (applying the *expressio unius* canon of construction: the expression of one thing implies the exclusion of others).

Kentucky caselaw is consistent with this understanding of the types of transactions at issue in § 552(1), even if the decisions don't draw the distinction in these specific terms. The parties address two decisions that consider whether particular information was supplied "for the guidance of others in their business transactions." § 552(1). These decisions decline to stretch the tort to its maximum linguistic limit, narrowing the set of business transactions potentially giving rise to liability. *See Carr v. Lake Cumberland Reg'l Hospital*, No. 15-cv-138, 2017 WL 1078636, at *3 (E.D. Ky. Mar. 21, 2017) ("Carr's decision to undergo bariatric surgery with Defendants was not a 'business transaction' in any ordinary sense of the phrase–it was a medical decision."); *Ky. Farm Bureau Mut. Ins. Co. v. Blevins*, 268 S.W.3d 368–372–73 (Ky. Ct. App. 2008) ("[A] private sale of residential property" between homeowners "was not a business transaction as is required by § 552.").

At least equally relevant is the fact that every Kentucky negligent-misrepresentation case cited by the parties addresses a company's provision of information to outsiders. *See, e.g., Helton v. Am. Gen. Life Ins. Co.*, 946 F. Supp. 2d 695, 705–08 (W.D. Ky. 2013) (customer claims against insurance advisor); *CAF & Assocs., LLC v. Portage, Inc.*, 913 F. Supp. 2d 333, 353 (W.D. Ky. 2012) (subcontractor claim against primary contractor "in [its] business or commercial capacity"); *Presnell*, 134 S.W.3d at 582–83 (building subcontractor's claim against construction manager);

*Ann Taylor, Inc. v. Heritage Ins. Servs., Inc.*, 259 S.W.3d 494 (Ky. Ct. App. 2008) (shipper's claim against insurer).  No case involved representations made by a company to its own workers.[9]  In light of contrary textual and precedential indications, therefore, the Court declines to extend the scope of § 552(1), as a matter of Kentucky law, to reach employer-employee communications of the sort Kannapel describes.

## III.   Statutory Claim:  Kentucky Wage & Hour Laws

In addition to his tort claims, Kannapel brings a statutory claim for violations of the Kentucky Wage and Hour Laws, KRS § 337.020.  The provision requires that "every employer doing business in this state shall, as often as semimonthly, pay to each of its employees all wages or salary earned to a day not more than eighteen (18) days prior to the date of that payment."  KRS § 337.020.  An employee wrongfully denied wages under this provision may recover unpaid wages, liquidated damages, and attorney's fees.  KRS § 337.385(1).  IBM maintains that Kannapel did not state a claim under § 337.020 for two reasons: (1) his commissions are not "wages" under the statute and (2) he never "earned" his commissions.  Motion to Dismiss at 12–14.

KRS § 337.010(1)(c)(1) defines "wages" as "any compensation due to an employee by reason of his or her employment, including salaries, commissions, vested vacation pay, overtime pay, severance or dismissal pay, earned bonuses, and any other similar advantages agreed upon by the employer and the employee or provided to employees as an established policy."  The statutory text is not entirely clear whether the statute covers all commissions, or only those "agreed upon" or provided under "an established policy."

The parties point to Kentucky caselaw asking if wages were "agreed upon," based on whether the parties "reasonabl[y] dispute" the wages owed and unpaid.  *See, e.g.*, *Bahill v. Flexsteel Indus., Inc*., No. 2019-ca-64, 2019 WL 6998646, at *2 (Ky. Ct. App. Dec. 20, 2019).[10]

---

[9] Ample out-of-state precedent supports this narrower interpretation, though the caselaw is hardly uniform in its outcome or reasoning.  Some decisions reject § 552 theories of employment liability on the grounds that: information provided to an employee does not guide the employee in a *business transaction*, *Shelby v. Delta Air Lines, Inc.*, 842 F. Supp. 999, 1015 (M.D. Tenn. 1993); *Colo. Nat. Bank of Denver v. Adventura Assocs.*, 757 F. Supp. 1167 (D. Colo. 1991) (same); employment claims would "endow every breach of contract [claim] with a potential tort claim for negligent promise," *Wilkinson v. Shoney's, Inc.*, 4 P.3d 1149, 1166–67 (Kan. 2000) (quotation omitted); the transactions did not involve "defendants in the profession or business of supplying information or opinions" to third parties, *Freeman v. Ernst & Young*, 516 N.W.2d 835, 838 (Iowa 1994); or the business transaction didn't involve a third party, *Oldenburg v. Hagemann*, 159 Ill.App.3d 631 (1986).  Other decisions, however, have applied § 552 in the employment context, citing the lack of an express limitation of its scope, *see Yeitrakis v. Schering-Plough Corp.*, 804 F. Supp. 238, 242 (D.N.M. 1992); and some courts even limit the applicability of § 552 to *only* the employment context, *see, e.g.*, *Eby v. York-Division, Borg-Warner*, 455 N.E.2d 623, 628–629 (Ind. App. 4th Dist. 1983).

[10] *See also Newton v. Air Sys., Inc*., No. 3:18-cv-497, 2020 WL 854192, at *3 (W.D. Ky. Feb. 20, 2020) (stating that courts may make a "reasonable dispute" determination at summary judgment, but declining to grant summary judgment because the two parties "put forth contradictory versions of events about the…contract terms"); *Kimmel v. Progress Paint Mfg. Co*., No. 2002-ca-273, 2003 WL 1226837, at *3 (Ky. Ct. App. Jan. 10, 2003) (affirming summary judgment for an employer who did not pay a commission to an employee because the parties reasonably disputed whether the employee earned the commission; the

But those decisions address a different provision (KRS § 337.060[11]), not § 337.020. The two provisions contain similar, but not identical, language. And it is hardly obvious that those courts' interpretation of "wages *agreed upon*," § 337.060, should control the interpretation of "any compensation due to an employee by reason of his or her employment, including salaries, *commissions*, [etc., etc.], and any other similar advantages *agreed upon* by the employer and the employee *or provided to employees as an established policy*," § 337.020.

Measured against the plain language of § 337.020, moreover, Kannapel's amended complaint adequately states a claim and avoids any need to assess whether the parties "reasonably dispute" the wages they "agreed upon." He clearly alleges that IBM withheld a "commission" in violation of the statute, regardless of whether the statute covers all commissions or only those "agreed upon" or "provided … as an established policy." KRS § 337.010(c)(1).

A plaintiff may trigger § 337.020 by pleading non-payment of "wages," which the General Assembly expressly defined to include "commissions." *See* KRS § 337.010. Kannapel's amended complaint focuses specifically on the non-payment of a commission, and therefore would appear to be covered on the face of the statute. IBM reads the definition not to include any and all commissions, however, but only those that were "agreed upon." KRS § 337.010. It understands this phrase to modify .010's entire list of items that can amount to wages—applying an interpretive tool known as the series-qualifier canon. *See Lewis v. Jackson Energy Co-op.*, 189 S.W.3d 87, 92 (Ky. 2005) (applying this canon to distribute an adjective to each of the nouns or phrases in a series).

But it is not so clear that the legislature used the trailing "agreed upon" phrase to modify the word "commission" and every other item in the list; it is at least equally plausible that it modifies only the final, open-ended item in that series—"any other similar advantages." Non-payment of "advantages" is amorphous and non-quantifiable in a way that non-payment of "salaries, commissions, vested vacation pay, overtime pay, severance or dismissal pay, [and] earned bonuses" is not. Given this potential ambiguity, cabining the final catch-all category to only those "advantages" that are "agreed upon by the employer and the employee" makes a great deal of sense.

Regardless, even applying IBM's preferred "series-qualifier" canon would not help it— because "agreed upon" is not the only potential modifier in the statute. The provision also refers to items "provided to employees as an established policy." If one phrase modifies commissions,

_____

parties had not "agreed upon" a commission "where there exists a *bona fide* dispute" about the employee's entitlement to the commission).

[11] IBM's motion to dismiss assumes that Kannapel pled a KRS § 337.060 claim, too. *See* Motion to Dismiss at 12. Kannapel's opposition (at 23, citing both provisions) assumes the same thing. KRS §337.060 is a distinct section of the Wage and Hour Statute. It prohibits the "withhold[ing] from any employee any part of the wage agreed upon." *See, e.g.*, *Bowman v. Builder's Cabinet Supply Co.*, No. 04-201-DLB, 2006 WL 2460817, at *9–10 (E.D. Ky. Aug. 23, 2006) (holding that § 337.060 did not apply to claimed commissions where the parties disputed the plaintiff's entitlement to the commissions). Regardless, Kannapel's amended complaint mentions only KRS § 337.020 violations, *see* Am. Compl. ¶¶ 134–145, and that is the only wage-and-hour claim this opinion addresses.

so does the other.[12]  IBM's motion disputes only the agreed-upon prong, omitting any mention of the following established-policy modifier.  Kannapel's opposition noted this elision, which proves fatal to IBM's motion.  Opp. at 24; *see also* Motion to Dismiss at 14 (mentioning only "agreed upon" commissions).  Even the more restrictive view of this provision would cover "similar advantages … provided … as an established policy."

And Kannapel indeed pled that IBM followed an "established policy" of making formulaic "commission" payments—a policy communicated through the PowerPoint presentations Kannapel received and allegedly relied on.  KRS § 337.010.  He asserts that "IBM promises that its sales representatives' commissions are unlimited and paid based on sales," and that IBM sales representatives "regularly received PowerPoint presentations describing the terms of the commission plans being offered to them." Am. Compl. ¶¶ 21, 24.  At least at the motion-to-dismiss stage, Kannapel has plausibly alleged that IBM departed from its established policy of paying employees predetermined commissions for their sales.[13]

This reading comports with the decisions of at least two other courts that have applied similar wage-and-hour laws to claims by IBM sales reps seeking unpaid commissions.  *See Vinson*, 2018 WL 4608250, at *9 (IBM sales representative stated claim under North Carolina wage-and-hour law because his unpaid commission was "compensation for his service … made pursuant to IBM's policy or practice of not capping commissions"); *see also Cahey*, 2020 WL 5203787, at *12–13 (IBM sales representative stated claim under Colorado wage-and-hour law because commissions could be "earned," for purposes of state law, when IBM no longer had discretion to adjust commissions).[14]  Given the plain language of .010–.020, the distinguishability of the precedents interpreting .060, the out-of-state precedent in support, and IBM's failure to address Kannapel's invocation of the "established policy" provision, the Court cannot dismiss the statutory claim as a matter of law.

## IV.    Equitable Claims:  Unjust Enrichment & Quantum Meruit

In addition to his tort and statutory claims, Kannapel asserts equitable claims for unjust enrichment and quantum meruit.  Although the parties argue the two equitable claims together, unjust enrichment and quantum meruit represent distinct theories under Kentucky law.  *See Isaacs v. Lawson*, 2012 WL 5274431, at *4 (Ky. Ct. App. Oct. 26, 2012) (distinguishing the two theories

---

[12] And in any event, it's hard to imagine a salary, commission, or vacation pay that is not either agreed upon or established through policy.

[13] The Motion to Dismiss (at 12) further contends that Kannapel hadn't yet "earned" his claimed wages under .020, but this characterization flatly contradicts Kannapel's pleading that he automatically qualified for a predetermined commission when he completed the Humana sale.

[14] The most analogous California wage-and-hour laws require an enforceable contract, so the statutory claims in IBM sales-rep cases in California turn on the presence or absence of an enforceable contract, which is not a dispositive issue under the plain text of .020 *or* the Kentucky precedents addressing "reasonably disputed" wages.  *Compare Lucas v. IBM*, No. 20-cv-141, 2020 WL 2494562, at *10 (N.D. Cal. May 14, 2020); *Beard v. IBM*, No. 18-cv-6783, 2020 WL 1812171, at *9 (N.D. Cal. Apr. 9, 2020); *Swafford v. IBM*, 408 F. Supp. 3d 1131, 1152–53 (N.D. Cal. 2019), *with Newton*, 2020 WL 854192, at *3; *Kimmel*, 2003 WL 1226837, at *3.

13

of recovery); *see also MidAmerican Distrib., Inc. v. Clarification Tech., Inc.*, 807 F. Supp. 2d 646, 680 (E.D. Ky. 2011) (analyzing unjust enrichment and quantum meruit as independent theories of recovery, but acknowledging that some cases "appea[r] to conflate the two theories").

A claim for unjust enrichment requires a plaintiff to show: "(1) benefit conferred upon defendant at plaintiff's expense; (2) a resulting appreciation of benefit by defendant; and (3) inequitable retention of that benefit without payment for its value." *Superior Steel, Inc. v. Ascent at Roebling's Bridge, LLC*, 540 S.W.3d 770, 777–78 (Ky. 2017) (cleaned up). And a quantum meruit claim requires a plaintiff to show (1) it rendered valuable services, (2) to the party it seeks to recover against, (3) with the opposing party accepting the services (4) "under such circumstances as reasonably notified the person that the plaintiff expected to be paid by that person." *Quadrille Bus. Sys. v. Ky. Cattlemen's Ass'n, Inc*, 242 S.W.3d 359, 366 (Ky. Ct. App. 2007) (quoting 66 Am. Jur. 2d Restitution & Implied Contracts § 38 (2001)). The key difference between the two causes of action is whether the defendant was on notice of the plaintiff's payment expectations, an issue that doesn't appear to be disputed at this stage. *See MidAmerican Distrib.*, 807 F. Supp. 2d at 681.

Several limitations, recognized in the caselaw, cabin these two theories. One is that an express contract precludes recovery under either theory. *See Furlong Dev. Co. v. Georgetown-Scott Cnty. Plan. & Zoning Comm'n*, 504 S.W.3d 34, 40 (Ky. 2016) ("[U]njust enrichment is unavailable when the terms of an express contract control."); *Vanhook Enters., Inc. v. Kay & Kay Contracting, LLC*, 543 S.W.3d 569, 574 (Ky. 2018) (denying a party's quantum meruit claim because a valid written contract governed the parties' relationship). But this case differs because both parties agree that Kannapel has no employment contract. Arg. Tr. at 50:16–19.

Yet it is still not clear whether the rarely implicated doctrines of unjust enrichment or quantum meruit should apply in this situation. Kentucky courts have not considered whether unjust enrichment or quantum meruit apply when a worker seeks a commission outside of any contractual relationship.[15]

An unpublished Kentucky Court of Appeals decision once denied a broker a commission based on equitable principles, but did so because the broker's involvement was "an overt attempt to interfere with the sale." *Wilson v. Com. Ky., Inc*., 2003 WL 23095730, at *2 (Ky. Ct. App. Dec. 31, 2003). That opinion gave no indication whether equitable relief would have been appropriate absent dilatory conduct by the broker. *See id*. Based on the arguments before the Court at this

---

[15] The most similar situation the Kentucky Supreme Court appears to have encountered did not involve unjust enrichment or quantum meruit at all. In *Cassinelli v. Holliday*, the Kentucky Supreme Court held a real estate agent was entitled to an unpaid commission on a property sale pursuant to a valid contract:

> Where a person is engaged as an agent to assist … in the sale … of property and he performs fully all of the obligations imposed on him by the contract, and his principal consummates the purchase or sale with the person the agent has negotiated with, the latter is entitled to his commission.

234 S.W.2d 945, 947 (Ky. 1950); *see also Bishop v. Am. States Life Ins. Co*., 635 S.W.2d 313, 314–15 (Ky. 1982) (holding that an insurance agent, who fulfilled all of his *contractual* obligations in making a sale, was entitled to recover his full commission in accordance with the terms of his contract).

stage, Kentucky law does not appear to have addressed whether and when a salesman who lacks a contract may rely on equitable principles to recover a commission.[16]

And the closest the Restatement (Third) of Restitution and Unjust Enrichment comes to addressing this situation appears to be § 48: "If a third person [which here would be Humana] makes a payment to the defendant [IBM] to which (as between claimant and defendant) the claimant [Kannapel] has a better legal or equitable right, the claimant is entitled to restitution from the defendant as necessary to prevent unjust enrichment." Although the provision doesn't speak in terms of commissions, an official comment suggests that it could apply to recovery of a percentage of a sale or other transaction. "In the case of a benefit to which the defendant is entitled jointly with the claimant, the defendant is liable in restitution for that portion of the benefit corresponding with the claimant's interest." Restatement (Third) of Restitution & Unjust Enrichment § 48 cmt. a. Again, however, the parties have not addressed the applicability of the Restatement or this theory to Kannapel's allegations. So the Court remains hesitant to conclude whether the claim would survive on this basis.

At this stage, therefore, the Court has no basis to dismiss the attempt to recover based on unjust enrichment and quantum meruit. No legal principles raised by IBM obviously preclude workers from recovering through unjust enrichment or quantum meruit in this situation. Instead, IBM mainly contends that the disclaimers in Kannapel's IPL preclude equitable recovery in the same manner that, according to IBM, they preclude tort liability. *See* Motion to Dismiss at 15–16. But the Court already rejected this argument. *See* § II(a) above. Kannapel's salary, IBM further contends, represents fair payment for his services. Motion to Dismiss at 16. Based on the pleadings, however, the Court cannot push aside Kannapel's assertion that his salary doesn't represent the fair value of his services. The parties haven't even pointed to Kannapel's base salary in the record. IBM's argument may prove better suited for summary judgment, when the Court has the benefit of a developed factual record. *See Options Home Health of N. Fla., Inc. v. Nurses Registry & Home Health Corp.*, 946 F. Supp. 2d 664, 675–76 (E.D. Ky. 2013) (concluding the court could not determine whether an employee's $65,000 salary was the "reasonable value" of an employee's services based on the undeveloped record). The Court denies IBM's motion to dismiss Kannapel's equitable claims for unjust enrichment and quantum meruit.

## V.   Conclusion

The Court denies in part and grants in part IBM's motion to dismiss the Amended Complaint (DN 14). The Court dismisses the negligent-misrepresentation claim only. Based on the filing of the Amended Complaint, the Court also denies as moot IBM's motion to dismiss the original complaint (DN 11).

---

[16] All of the successful quantum-meruit claims discussed in published Kentucky caselaw appear to address the claims of attorneys who performed worked in expectation of a contingency fee but were terminated before a favorable recovery. *See, e.g.*, *Hughes & Coleman, PLLC v. Chambers*, 526 S.W.3d 70, 74–75 (Ky. 2017); *Baker v. Shapero*, 203 S.W.3d 697, 699 (Ky. 2006); *Garmer & Prather, PLLC v. Independence Bank*, 538 S.W.3d 315, 320–22 (Ky. Ct. App. 2017); *Bradley v. Estate of Lester*, 355 S.W.3d 470, 472 (Ky. Ct. App. 2011). These decisions, however, do not expressly limit quantum meruit to that narrow circumstance.

cc:     Counsel of Record

Benjamin Beaton, District Judge

United States District Court

September 13, 2021